UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

------------------------------------------------------------------  x
DARRYL CRENSHAW,                                                     :
                                                                    :
                                   Plaintiff,                       :
                                                                    :
              v.                                                    :    3:25-CV-1726 (SFR)
                                                                    :
TAWANA FURTICK, *et al*,                                            :
                                                                    :
                                   Defendants.                      :
------------------------------------------------------------------  x

**INITIAL REVIEW ORDER**

Plaintiff Darryl Crenshaw, a man serving a sentence of incarceration in the custody of the Connecticut Department of Correction ("DOC"), has filed a Complaint under 42 U.S.C. § 1983 and Connecticut state law.[1] Crenshaw contends that correctional medical staff at MacDougall-Walker Correctional Center ("MacDougall"), failed to provide appropriate treatment for his respiratory illness and knee injuries. Crenshaw claims damages and seeks injunctive relief from DOC employees Tawana Furtick, Jennifer Cruz, Vivianne Martel, J. Jackson, Jasmine Rivera, Dr. Estime, and Colleen Gallagher (collectively "Defendants"), in their individual and official capacities.

For the reasons that follow, Crenshaw's claims of Eighth Amendment deliberate indifference to serious medical needs related to his respiratory illness and knee pain may proceed against Defendants Dr. Estime and Vivianne Martel in their individual capacities. Crenshaw's Eighth Amendment deliberate indifference claim related to his knee injury may

---

[1] I take judicial notice of the Department of Correction's public records, which disclose that Crenshaw has been imprisoned since January 2009 and was sentenced in April 2015. *See Costa v. Kocaqi*, No. 3:24-CV-01586 (KAD), 2025 WL 1207538, at *2 n.3 (D. Conn. Apr. 25, 2025).

1

proceed against Dr. Estime in his individual capacity. Crenshaw's official capacity claims may proceed against Cruz, Martel, Dr. Estime, and Gallagher. Crenshaw's state-law medical malpractice claim related to his respiratory illness may also proceed against Dr. Estime. All other claims are dismissed, and all other defendants are terminated.

## I.     FACTUAL BACKGROUND

Although I do not set forth all the facts asserted in Crenshaw's complaint, I will summarize his basic factual contentions here to give context to my ruling below. Because Crenshaw's claims involve largely unrelated events, I will summarize Crenshaw's assertions regarding his respiratory illness first and then summarize his assertions regarding his knee injuries next.

### A.     Respiratory Illness

In early January 2025, Crenshaw reported to prison officials that he was "suffering from a violent, painful cough" that affected his "ability to breath[e]" and "caused headaches and vomiting." Compl. ¶ 12, ECF No. 1. Crenshaw requested a "sick call" visit in mid-January but received no response. *Id.* ¶ 13. Crenshaw again requested a sick call visit in late January, describing "what he thought may be long[-]term covid symptoms." *Id.* ¶ 14. Prison officials told Crenshaw that they would place him on a list to be seen at sick call. *Id.* Multiple sick call dates came and went without medical staff seeing Crenshaw. *Id.* ¶ 15.

Medical staff saw Crenshaw for the first time in mid-February after a correctional officer requested an emergency visit. *Id.* ¶ 16. Sometime after this visit, Crenshaw saw Dr. Estime, who prescribed Crenshaw Mucinex but refused to attempt to diagnose Crenshaw. *Id.* ¶ 17. The Mucinex had no effect on Crenshaw's cough. *Id.* ¶ 18. Crenshaw approached prison

officials about his cough during a "wellness check" in mid-March. *Id.* ¶ 19. Prison officials told Crenshaw to write sick call. *Id.*

Crenshaw thereafter filed an inmate request related to the lack of care he received at the wellness check. *Id.* The inmate request went unanswered. *Id.* Crenshaw filed a Level 1 health services grievance related to the inmate request. *Id.* The Level 1 health services grievance went unanswered. *Id.* Crenshaw filed a Level 2 health services grievance. *Id.* Prison officials rejected the Level 2 health services grievance. *Id.* After meeting with prison officials, however, prison officials upheld the Level 1 health services grievance and scheduled a meeting with "R.C.O.O. Cruz." *Id.* This meeting with Cruz never occurred, and prison officials did not resolve the subject of the Level 1 health services grievance. *Id.*

The day after the wellness check, Crenshaw's coughing became severe enough that he vomited. *Id.* ¶ 20. A correctional officer thought Crenshaw was overdosing on drugs. *Id.* After Crenshaw explained to the officer why he was vomiting, another correctional officer contacted the medical department to tell them that Crenshaw had a severe cough and was having difficulty breathing. *Id.* Vivianne Martel, the Correctional Head Nurse, *id.* ¶ 6, told the officer to "wait until [Crenshaw] falls out[,] and call a code white," which Crenshaw describes as a "medical emergency on the radio." *Id.* ¶ 22.

Prison staff made "multiple emergency third party referrals to sick call" later that day. *See id.* ¶ 25. A "concerned nurse" contacted a medical provider, who prescribed Crenshaw a steroid. *Id.* Two days after the provider prescribed the steroid, Crenshaw "was skipped for med-line." *Id.* ¶ 26. A nurse refused to open Crenshaw's cell door after Crenshaw explained his need for the medication. *Id.* Crenshaw did not receive the medication. *Id.* A correctional officer made another emergency referral to sick call after Crenshaw failed to receive his

3

medication. *See id.* ¶ 27. Crenshaw then saw a medical provider named Eva, who "incorrectly" diagnosed Crenshaw as having bronchitis. *Id.* Eva provided an antibiotic and breathing treatment to be used with the steroid. *Id.* ¶ 28. Crenshaw's cough persisted despite the treatment prescribed. *Id.* ¶ 29.

Crenshaw later went through the administrative remedy process described above, receiving the same results. *See id.* ¶ 24. Crenshaw and his then-fiancé also wrote Colleen Gallager, the Health Services Director in DOC's central office. *Id.* ¶¶ 10, 30-31. Gallagher responded to Crenshaw's fiancé and forwarded Crenshaw's complaint to Cruz. *Id.* ¶ 32. Crenshaw's fiancé then contacted Cruz, who responded to Crenshaw's fiancé by email. *Id.* ¶ 33. Gallagher wrote Crenshaw in mid-May to tell Crenshaw that "there may be a processing or mail system error" and that Cruz would investigate. *Id.* ¶ 34. J. Jackson, the Health Services Administrative Remedy Coordinator, also wrote to Crenshaw to tell him that there had been a delay in processing health services grievances "due to unforeseen circumstances." *Id.* ¶¶ 7, 35.

Crenshaw filed other inmate request forms about his cough in mid-June and mid-July. *Id.* ¶¶ 36-37. Crenshaw filed his request in July after coughing so hard that he "possibly suffered a herniated belly button." *Id.* ¶ 37. Crenshaw "could actually feel his insides protruding out of his belly button." *Id.* Dr. Estime saw Crenshaw in mid-August. *Id.* ¶ 38. Crenshaw was mainly concerned with obtaining a diagnosis during that visit. *Id.* ¶ 39. Dr. Estime opined that Crenshaw did not have bronchitis, but Dr. Estime's priority was treating Crenshaw's symptoms, not providing a diagnosis. *Id.* Dr. Estime was nevertheless "concern[ed]" with how long Crenshaw's cough had persisted and indicated that a pulmonary specialist would need to see Crenshaw. *Id.* ¶ 40. Dr. Estime also "re-prescribed" the same medication regimen that Eva had prescribed, adding only an inhaler. *Id.* ¶ 41.

4

Three days passed without Crenshaw receiving the medications Dr. Estime prescribed. *See id.* ¶ 44. A nurse called Dr. Estime to confirm Crenshaw's prescriptions. *Id.* Dr. Estime had not filled the prescriptions or set up an appointment with a pulmonary specialist. *Id.* ¶ 45. Crenshaw saw Dr. Estime again in late August. *Id.* ¶ 46. Crenshaw told Dr. Estime that the medications he received were ineffective and that Crenshaw had not received an inhaler or breathing treatment. *Id.* Dr. Estime again prescribed the same medication regimen as he had before and expressed the need for Crenshaw to see a pulmonary specialist. *Id.* ¶ 47. However, Dr. Estime again failed to fill the prescription for the inhaler and breathing treatment or schedule an appointment with a pulmonary specialist. *Id.* ¶ 48.

Crenshaw saw Dr. Estime again in early April 2025. *Id.* ¶ 49. Dr. Estime had not made the appointment with the pulmonary specialist, though he had filled the prescription for the inhaler. *Id.* Dr. Estime told Crenshaw that he would have to see how the inhaler worked before scheduling an appointment with a pulmonary specialist. *Id.* ¶ 50. After "ongoing settlement negotiations" with an Assistant Attorney General, Dr. Estime "supposedly" made an appointment for Crenshaw to see a pulmonary specialist. *Id.* ¶ 51 (internal quotation marks omitted). To date, Crenshaw has not seen a pulmonary specialist and he continues to suffer from a "violent and painful cough." *Id.* ¶ 52.

### B.      Knee Injuries

Crenshaw also has two surgically repaired knees that cause him "severe knee pain and numbness." *Id.* ¶ 53. Crenshaw began writing inmate requests complaining of knee pain in April 2025. *Id.* ¶ 54. He wrote an inmate request in May 2025 seeking treatment for what seemed to be ligament damage in both knees. *Id.* ¶ 55. In response, medical staff administered

"5 or 6" X-rays on Crenshaw's knees. *Id.* ¶ 56. Medical staff did not discuss the results of the X-rays with Crenshaw. *Id.* ¶ 57.

Crenshaw met with Dr. Estime in August 2025 to discuss Crenshaw's knee pain. *Id.* ¶ 58. Dr. Estime ordered more X-rays despite having access to the X-rays already administered and Crenshaw's concern that ligament damage could not be seen on X-rays. *Id.* ¶ 59. Dr. Estime also stated he would obtain Crenshaw's post-surgery MRIs taken over ten years ago. *Id.* ¶ 60. Dr. Estime did not physically examine Crenshaw's knees or discuss existing X-rays with Crenshaw. *Id.* ¶ 61.

Crenshaw met with Dr. Estime approximately two weeks later to continue discussing Crenshaw's knee injuries. *Id.* ¶ 63. Dr. Estime had forgotten to obtain Crenshaw's post-surgery MRIs and attempted to order the X-rays that Dr. Estime purportedly ordered at Crenshaw's last visit. *Id.* ¶ 64. Dr. Estime did not physically examine Crenshaw's knees or discuss the existing X-rays at this appointment, either. *Id.* ¶ 65.

Crenshaw met with Dr. Estime again in September 2025 to discuss Crenshaw's knee pain. *Id.* ¶ 66. Crenshaw sought an MRI on both knees. *Id.* Dr. Estime had not obtained Crenshaw's post-surgical MRIs, did not physically examine Crenshaw's knees, and did not discuss existing X-rays with Crenshaw. *Id.*

Crenshaw was eventually able to negotiate an appointment with an orthopedic doctor through the Attorney General's office. *Id.* ¶ 67. The orthopedic doctor discussed Crenshaw's X-ray results at that appointment. *Id.* ¶ 68. The orthopedic doctor told Crenshaw that he had "highly visible and prominent large bone ossicles" that were large enough to interfere with the movement in Crenshaw's knees and cause him pain. *Id.* ¶ 69 (capitalization modified). The orthopedic doctor conducted a physical examination of Crenshaw's knees, during which the

doctor determined that Crenshaw's left knee required surgery. *Id.* ¶ 70. The orthopedic doctor also ordered MRIs for both knees because the right knee was "all but guaranteed" to need surgery, too. *Id.* ¶ 71.

As of the date of filing his complaint, Crenshaw continued to suffer pain and numbness in his knees and was not receiving any medical care for his knee injuries. *Id.* ¶ 72.

## II.    LEGAL STANDARD

Pursuant to 28 U.S.C. § 1915A, courts must review civil complaints in which a prisoner seeks redress from a governmental entity and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1)-(2).

Although highly detailed allegations are not required, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This plausibility standard is not a "probability requirement" but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.*

In undertaking this analysis, the court must "draw all reasonable inferences in [a plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). But the court is not "bound to accept

7

conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678.

With respect to *pro se* litigants, it is well-established that "[p]ro se submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (summary order) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (*per curiam*)).

## III.    DISCUSSION

The Complaint asserts two separate claims of deliberate medical indifference in violation of the Eighth Amendment. Compl. 6, 16, 21. The first claim relates to Crenshaw's respiratory illness. The second claim relates to his knee pain. As I explain below, both claims— together with a Connecticut state-law claim of medical malpractice—may proceed to service.

### A.    Deliberate Indifference to Serious Medical Needs Standard

The Supreme Court has held that deliberate indifference by prison officials to an incarcerated person's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). There is a subjective and an objective component to an Eighth Amendment claim for deliberate indifference. *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).

To establish the objective component of an Eighth Amendment deliberate indifference claim, the alleged deprivation of medical care must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). This objective showing in turn requires a court to make two inquiries. *See Salahuddin*, 467 F.3d at 279. First, I must determine whether the plaintiff was "actually deprived of adequate medical care." *Id.* A "prison official's duty is only to provide

reasonable care," so "prison officials who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 279-80 (citation and internal quotation marks omitted; alteration adopted). Second, I must determine "whether the inadequacy in medical care is sufficiently serious," which requires examining "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the [plaintiff]." *Id.* at 280. This will differ based on whether the issue is failure to provide *any* medical treatment, inadequate treatment, or delayed treatment. *See Smith v. Carpenter*, 316 F.3d 178, 184-86 (2d Cir. 2003). This inquiry is "necessarily contextual," "fact-specific," and "must be tailored to the specific circumstances of each case." *Id.* at 185 (brackets and internal quotation marks omitted).

"[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280 (citing *Smith*, 316 F.3d at 185-86). Deciding whether a condition is sufficiently serious requires courts to consider whether "a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and brackets omitted). A medical condition may not initially be serious, but may become serious because it is degenerative and, if left untreated or neglected for a long period of time, will "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000).

If treatment is given but the plaintiff alleges it is inadequate, "the seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280. I then focus on the "inadequacy itself." *Valdiviezo*

9

*v. Boyer*, 752 F. App'x 29, 32 (2d Cir. 2018) (summary order) (citing *Salahuddin*, 467 F.3d at 280 (citation omitted)). If "the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* . . . rather than the prisoner's *underlying medical condition* alone" to determine whether the deprivation satisfies the objective requirement. *Smith*, 316 F.3d at 185 (emphasis in original).

To satisfy the subjective component of an Eighth Amendment deliberate indifference claim, a defendant must have "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280. Deliberate indifference is more than mere negligence—it is equivalent to "criminal recklessness," where an individual "disregards a risk of harm of which he is aware." *Farmer v. Brennan*, 511 U.S. 825, 837, 840 (1994). In general, medical malpractice does not equate to deliberate indifference. *Estelle*, 429 U.S. at 106. Medical malpractice, may, however, rise to deliberate indifference if it "involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Salahuddin*, 467 F.3d at 280.

## 1.     Respiratory Illness Claim for Damages

I must first decide whether any defendant actually "deprived [Crenshaw] of adequate medical care" in connection with his respiratory illness. *Salahuddin*, 467 F.3d at 281. This initial requirement of the objective prong is satisfied because the Complaint alleges that

10

Defendants (1) provided ineffective medical attention and (2) failed to schedule an appointment with a pulmonary specialist.

I must next consider "whether the inadequacy in medical care is sufficiently serious," *Salahuddin*, 467 F.3d at 280, which turns on whether Defendants failed to provide any medical treatment, rendered inadequate treatment, or improperly delayed treatment. *See Smith*, 316 F.3d at 184-86. Because medical staff provided *some* treatment (however inadequate), I must focus on the "inadequacy itself," *Valdiviezo*, 752 F. App'x at 32, instead of "whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. Here, Crenshaw repeatedly told medical staff about a cough so violent that "he could actually feel his insides protruding out of his belly button." Compl. ¶ 37. The cough was serious enough to cause Crenshaw to vomit to the point that correctional officers thought he was overdosing on drugs. *Id.* ¶ 20. Yet, according to the Complaint, the medical staff responded—when Crenshaw eventually obtained an appointment only after going to great lengths to do so—by prescribing drugs and treatments that were either ineffective or not actually given to Crenshaw. *See id.* ¶¶ 25-26, 41, 46-48. These allegations are sufficient to satisfy the objective component for purposes of initial review. *See, e.g.*, *Chance*, 143 F.3d at 702 (observing that objective component was satisfied where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain") (citation and internal quotation marks omitted).

Having concluded that the Complaint satisfies the objective requirement of an Eighth Amendment claim, I turn next to the subjective prong. I begin by addressing the personal involvement of each Defendant named in the caption of the Complaint. *See Mastroianni v. Reilly*, 602 F. Supp. 2d 425, 433 (E.D.N.Y. 2009) (noting that "[t]he subjective prong of the

11

two[-]step analysis requires personal involvement of the prison official"); *accord Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). I conclude that the Complaint adequately states a claim only as to Dr. Estime and Vivianne Martel.[2]

"The Second Circuit has defined 'personal involvement' to mean direct participation, such as 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others to do the unlawful acts.'" *Rivera v. Viger*, No. 3:21-cv-00470 (VAB), 2021 WL 3269095, at *3 (D. Conn. July 30, 2021) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). When a defendant is a supervisory official, as many are here, "a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020). A plaintiff may not sue a defendant for a constitutional violation committed by another defendant solely based on his or her "high position of authority in the prison system." *Wright*, 21 F.3d at 501.

Crenshaw describes Martel as telling an officer to "wait until [Crenshaw] falls out[,] and call a code white" after the officer told Martel that Crenshaw had a severe cough and was having trouble breathing. Compl. ¶ 21. And Crenshaw describes Dr. Estime as failing to fill prescriptions or schedule his promised referral to a specialist despite Dr. Estime's awareness of Crenshaw's condition. *See id.* ¶ 45. These assertions are sufficient to show Martel and Dr. Estime's personal involvement and thus satisfy the subjective element for purposes of initial

---

[2] As I explained in the Introduction, the Complaint asserts claims against Tawana Furtick, Jennifer Cruz, Vivianne Martel, J. Jackson, Jasmine Rivera, Dr. Estime, and Colleen Galagher. Compl. ¶¶ 4-10.

review. *See Crispin v. Dougherty*, No. 3:25-CV-00428 (SVN), 2025 WL 2223893, at *9 (D. Conn. Aug. 5, 2025) (plaintiff's allegation that medical staff denied medical care to plaintiff when he arrived at medical department and "after he returned to it feeling weak, light-headed, dizzy, and struggling to breathe" satisfied subjective component); *Collymore v. Comm'r of D.O.C.*, No. 3:21-CV-303 (SVN), 2024 WL 4008238, at *3-4 (D. Conn. Aug. 30, 2024) (concluding that subjective requirement was satisfied because "Plaintiff's well-pleaded facts show that it is at least plausible that Defendant knew of and consciously disregarded an excessive risk to inmate health or safety by ignoring Plaintiff's complaints about how his prescription failed to alleviate his serious symptoms") (citation and internal quotation marks omitted).

In contrast, the Complaint fails to state a claim as to Defendants Furtick, Cruz, Jackson, Rivera, and Gallagher. *See* Compl. ¶¶ 4-10. Crenshaw does not mention Furtick or Rivera in the body of the complaint. Accordingly, I cannot consider Furtick or Rivera personally involved. *See Schlosser v. Droughn*, No. 3:19-CV-1445 (SRU), 2020 WL 59942, at *3 (D. Conn. Jan. 6, 2020) (dismissing claims against defendant whom plaintiff "d[id] not mention . . . in his statement of facts" for lack of personal involvement).

Crenshaw describes Cruz as receiving complaints from Crenshaw's fiancé. Compl. ¶¶ 32-33. Crenshaw describes Jackson as writing a letter to Crenshaw explaining that there had been a delay in processing health services grievances. *See* Compl. ¶ 35. But these allegations against Cruz and Jackson, standing alone, do not plausibly suggest deliberate indifference.

Lastly, Crenshaw states that he wrote Gallagher "in an effort to bring attention to his situation," and that Crenshaw's fiancé "relayed his and her concerns directly" to Gallagher. Compl. ¶¶ 30-31. Gallagher "acknowledged and responded" to Crenshaw's fiancé and

13

forwarded Crenshaw's complaints to Cruz. *Id.* ¶ 32. Gallagher then wrote a letter to Crenshaw indicating that "there may be a processing or mail system error" and that Cruz "can investigate." *Id.* ¶ 34 (internal quotation marks omitted). Some courts have recognized that "when a supervisory prison official receives a particular grievance, personally reviews it, and responds and/or takes action in response, such conduct may constitute sufficient 'personal involvement' to establish individual liability for the alleged constitutional violation." *Young v. Choinski*, 15 F. Supp. 3d 172, 191 (D. Conn. 2014).

But in reviewing Gallagher's letter (attached to Crenshaw's complaint), Gallagher did not respond to a "grievance" regarding Crenshaw's deficient medical care. *See* Compl. 40. She responded to Crenshaw's "alleg[ation] that 'MacDougall CI is intentionally interfering with the 9601 and 8901 filing process.'" *Id.* As such, Gallagher's letter addressed the grievance process, not deficient medical care. *See id.* Accordingly, nothing in Gallagher's response would suggest that she "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result" from the actions or inactions of medical staff. *Salahuddin*, 467 F.3d at 280. The Complaint therefore fails to state a viable Eighth Amendment claim against Gallagher.

Crenshaw may pursue his Eighth Amendment deliberate indifference to serious medical needs claim related to his respiratory illness only against Martel and Dr. Estime. But this claim is dismissed without prejudice as to all other Defendants.

### 2.    Knee Injuries Claim for Damages

I must next decide whether Dr. Estime "actually deprived [Crenshaw] of adequate medical care" in connection with his knee injuries. *Salahuddin*, 467 F.3d at 279. Because the Complaint alleges that Dr. Estime failed to physically examine Crenshaw's knees, discuss

existing X-rays with Crenshaw, or obtain Crenshaw's post-operative MRIs, Compl. ¶¶ 61, 65, 66, I conclude for purposes of initial review that Dr. Estime actually deprived Crenshaw of medical care.

I must then consider "whether the inadequacy in medical care is sufficiently serious," *Salahuddin*, 467 F.3d at 280. The Second Circuit has identified several non-exhaustive factors relevant to the inquiry into the seriousness of a medical condition: "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). The Complaint alleges that Crenshaw's medical providers later detected "highly visible and prominent large bone ossicles" in his knees. Compl. ¶ 69 (cleaned up). Crenshaw's left knee required surgery, and his right knee was "all but guaranteed" to require surgery, too. *Id.* ¶¶ 70-71. For purposes of initial review, I assume that knee injuries requiring surgery are "sufficiently serious." *Salahuddin*, 467 F.3d at 280; *see also Rodriguez v. Fed. Bureau of Prisons*, No. 9:10-CV-1013 LEK/TWD, 2012 WL 6965109, at *9 (N.D.N.Y. Nov. 30, 2012) (objective component satisfied where "[t]wo orthopedic surgeons found the condition of Plaintiff's knee not only worthy of treatment but in need of surgery"), *report and recommendation adopted*, 2013 WL 375537 (N.D.N.Y. Jan. 30, 2013).

I turn next to the subjective requirement. "To satisfy the subjective component of the Eighth Amendment's deliberate indifference standard, a defendant must have been aware of a substantial risk that the incarcerated individual would suffer serious harm because of his or her actions or inactions." *Torres v. Reis*, No. 22-CV-1008 (SFR), 2025 WL 2374003, at *10 (D. Conn. Aug. 14, 2025) (citing *Salahuddin*, 467 F.3d at 280). "Although *Farmer* requires that a

15

plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (citing *Farmer*, 511 U.S. at 842). "Deliberate indifference may also be inferred where treatment was cursory or evidenced apathy." *Bardo v. Wright*, No. 3:17-CV-1430 (JBA), 2019 WL 5864820, at *6 (D. Conn. Nov. 8, 2019) (citation and internal quotation marks omitted).

The Complaint alleges that Crenshaw began submitting inmate requests to Defendants in April 2025 that described "growing pain in both of his knees." Compl. ¶ 54. Crenshaw later alerted Defendants that he believed he was experiencing ligament damage in both of his knees. *Id.* ¶ 55. In August 2025, Crenshaw met with Dr. Estime and "discussed with the doctor his knee pain and prior surgeries." *Id.* ¶ 58. Dr. Estime nonetheless declined to physically examine Crenshaw. *Id.* ¶ 61. Instead, Dr. Estime committed to ordering X-ray testing and said he would request Crenshaw's MRIs from ten years ago. *See id.* ¶¶ 59-60. But when Crenshaw met with Dr. Estime again on August 24, 2025, the Complaint alleges that Dr. Estime had still not reviewed the MRIs. *Id.* ¶ 63. During this visit, Dr. Estime again declined to conduct a physical examination. *Id.* In September 2025, as a result of Crenshaw's "ongoing negotiations with the Assistant Attorney General" assigned to another of his cases, Crenshaw received an appointment with an outside orthopedic doctor. *Id.* ¶ 67. In that outside visit with an outside provider at UConn Health, the outside doctor reviewed Crenshaw's X-rays, conducted a physical examination of Crenshaw, *id.* ¶ 68, and "determine[d] that the Plaintiff's left knee required surgery to repair the failed results of his prior surgery," *id.* ¶ 70.

These allegations plausibly support the inference that Dr. Estime evinced apathy in response to Crenshaw's numerous reports of serious knee pain and offered only cursory

16

treatment during his three visits with Crenshaw in August 2025. The Complaint also adequately alleges that Dr. Estime ignored an obvious risk to Crenshaw's health by delaying a referral to an outside specialist, who "immediately" determined that Crenshaw required surgery. *Id.* ¶ 70. Crenshaw may therefore proceed with an Eighth Amendment claim of deliberate medical indifference related to his knee pain against Dr. Estime.

### 3.      Official Capacity Claims

Crenshaw sues Defendants in their official capacities. To the extent he asserts official capacity claims for monetary damages against Defendants (all state employees), such claims are dismissed as barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

Crenshaw may proceed for injunctive or declaratory relief against a defendant in his or her official capacity only to the extent he alleges an ongoing constitutional violation. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254-55 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer*, 511 U.S. at 846-47).

The Complaint alleges that Crenshaw continues to seek treatment for his painful cough and knee pain. Compl. ¶¶ 52, 72. I therefore conclude that the Complaint supports a finding that Crenshaw is experiencing an actual and imminent violation of his constitutional rights. *See, e.g.*, *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (stating that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm"). Defendants Jennifer Cruz (Regional Chief Operating Officer), Vivianne Martel (Correctional Head Nurse

at MacDougall), Dr. Estime (a provider at MacDougall), and Colleen Gallagher (Health Services Director at DOC's Central Office) all appear to be involved in controlling Crenshaw's access to medical care. Compl. ¶¶ 5-10. Accordingly, Crenshaw may proceed on an official capacity claim against Cruz, Martel, Estime, and Gallagher.

### B.     State-Law Medical Malpractice Claim

Crenshaw also brings a medical practice claim under state law. *See* Compl. 21. Because I have permitted Crenshaw's deliberate indifference claim related to his respiratory illness to proceed to service, I will exercise supplemental jurisdiction over Crenshaw's state-law medical malpractice claim and permit that claim (as it relates to the respiratory illness only) to proceed to service against Dr. Estime. *See* 28 U.S.C. § 1367(a); *Bibiloni v. Doe*, No. 24-CV-1583 (VDO), 2024 WL 4744662, at *4 (D. Conn. Nov. 12, 2024) (permitting state law claims of medical malpractice and negligence to proceed to service where court permitted factually related deliberate indifference claim to proceed to service); *Blaine v. UConn Health Care*, No. 3:18-CV-359 (MPS), 2018 WL 1368909, at *3 (D. Conn. Mar. 16, 2018) (same).

### IV.     <u>CONCLUSION</u>

I enter the following orders:

(1) Crenshaw's Eighth Amendment deliberate indifference to serious medical needs claim for damages related to his respiratory illness may proceed against Martel and Dr. Estime in their individual capacities for further development of the record.

(2) Crenshaw's Eighth Amendment deliberate indifference to serious medical needs claim for damages related to his knee pain may proceed against Dr. Estime in his individual capacity for further development of the record.

(3) Crenshaw's Eighth Amendment deliberate indifference to serious medical needs claim for injunctive relief related to his respiratory illness and knee pain may proceed against Cruz, Martel, Estime, and Gallagher in their official capacities.

(4) Crenshaw's state-law medical malpractice claim may also proceed against Dr. Estime for further development of the record.

(3) All other claims are **DISMISSED WITHOUT PREJUDICE** under 28 U.S.C. § 1915A(b)(1). All other defendants are terminated.

(4) On or before May 15, 2026, the Clerk shall verify the current work address of Martel and Dr. Estime, and mail a copy of the complaint, this order, and a waiver of service of process request packet to Martel and Dr. Estime in their individual capacities at their confirmed address. On the thirty-fifth (35th) day after mailing, the Clerk shall report to the Court on the status of each request. If Martel and Dr. Estime fail to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service and Martel and Dr. Estime shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(5) The Clerk is instructed to prepare a summons form and send an official capacity service packet to the U.S. Marshal Service. The U.S. Marshal Service is directed to effect service of the Complaint and this Order on Defendants Cruz, Martel, Estime, and Gallagher in their official capacity at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, on or before May 29, 2026, and to file a return of service on or before June 12, 2026.

(6) The Clerk shall send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the DOC Legal Affairs Unit.

(7) If Crenshaw changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he **MUST** notify the court. Failure to do so can result in the dismissal of the case. Crenshaw must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. Crenshaw should also notify Defendants or defense counsel of his new address.

(8) While incarcerated, Crenshaw shall use the Prisoner Electronic Filing Program when filing documents with the court. Crenshaw is advised that the Program may be used only to file documents with the court. Local rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R 5(f). Therefore, discovery requests must be served on Defendants' counsel by regular mail.

**SO ORDERED.**

New Haven, Connecticut
April 24, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

20